### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | |
|---|---|
| **DARLING'S, d/b/a/ DARLING'S AUTO MALL,** ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| *v.* ) | ***Docket No. 05-59-B-S*** |
| ) | |
| **GENERAL MOTORS CORPORATION,** ) | |
| ) | |
| *Defendant* ) | |

### RECOMMENDED DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiff in this action which was removed from the Maine Superior Court (Penobscot County) seeks partial summary judgment to the effect that one of the defendant's policies violates 10 M.R.S.A. § 1174(3)(M) and that a contract between the parties that incorporates this policy is invalid and unenforceable.  Plaintiff's Motion for Partial Summary Judgment, etc. ("Plaintiff's Motion") (Docket No. 22) at 1.  In turn, the defendant seeks summary judgment on all of the claims asserted against it.  Defendant General Motors Corporation's . . . Cross-Motion for Summary Judgment ("Defendant's Motion") (Docket No. 28) at 1.[1]  I recommend that the court deny the plaintiff's motion and grant that of the defendant.

### I.  Summary Judgment Standard

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[1] The defendant requests oral argument on its motion.  Defendant's Motion at 1.  The parties' papers provide a sufficient basis on (*continued on next page*)

56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003).  "[T]he court must mull each motion separately, drawing inferences against each movant in turn."  *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for

---

which to decide the pending motions.  The request for oral argument is accordingly denied.

summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.*  Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.  As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

## B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material

3

properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted." (Citations and internal punctuation omitted).

## II. Factual Background

The parties' statements of material facts, submitted pursuant to this court's Local Rule 56, include the following relevant undisputed facts.

The defendant is a Delaware corporation that manufactures and distributes motor vehicles in the United States through a network of authorized dealers operating under the Buick, Chevrolet, Pontiac, GMC and Cadillac trade names. Statement of Undisputed Facts In: (1) Opposition To Darling's Motion For Summary Judgment, etc. ("Defendant's SMF") (Docket No. 32) ¶ 1; Darling's d/b/a Darling's Auto Mall's Response to General Motors Corporation's Statement of Undisputed Facts ("Plaintiff's Responsive SMF") (Docket No. 38) ¶ 1. The plaintiff is a Maine corporation that owns and operates new and used motor vehicle dealerships in Maine. *Id*. ¶ 2.

In 1997 the plaintiff was a General Motors dealership with a location at 265 High Street in Ellsworth, Maine. Plaintiff's Statement of Material Facts Not in Dispute ("Plaintiff's SMF") (Docket No. 23) ¶ 1; General Motors Corporation's Response to Plaintiff's Statement of Material Facts Not in Dispute ("Defendant's Responsive SMF") (Docket No. 31) ¶ 1. The plaintiff's General Motors dealership in Ellsworth included Oldsmobile and Cadillac vehicles until those lines were terminated by agreement dated December 22, 1997. *Id*. ¶ 2. In 1997 the plaintiff operated its General Motors

4

dealership on the same premises as its Chrysler dealership in Ellsworth, selling new motor vehicles under Chrysler's Jeep and Eagle nameplates. *Id*. ¶¶ 3-4. The plaintiff also operates a Ford, Volkswagen and Audi dealership on Hogan Road in Bangor, Maine and a Volvo, Nissan and Honda dealership on Sylvan Road in Bangor, Maine. Defendant's SMF ¶ 5; Plaintiff's Responsive SMF ¶ 5. At the request of the defendant, the plaintiff agreed in 1997 to discontinue sales of the Oldsmobile and Cadillac nameplates at its Ellsworth location. Plaintiff's SMF ¶ 5; Defendant's Responsive SMF ¶ 5.

The plaintiff has been an authorized dealer of General Motors automobiles and products since 1994 under successive dealer agreements, the most recent of which is dated November 1, 2005. Defendant's SMF ¶ 3; Plaintiff's Responsive SMF ¶ 3. The standard provisions in the 2000 dealer agreement include the following:

> If Dealer wants to make any change in location(s) or Premises [*i.e*., approved location(s) and facilities], or in the uses previously approved for those Premises, dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of deal [sic] network planning considerations. No change in location or in the use of the Premises, including the addition of any other vehicle lines, will be made without General Motors prior written authorization pursuant to its business judgment.

*Id*. ¶ 4.

In the mid-1990s, the defendant announced a nationwide dealer network plan called "Project 2000," which involved realigning its franchises and consolidating its dealerships in certain markets. *Id*. ¶ 8. In March 1996 the defendant presented the plaintiff with its Project 2000 dealer network plan for the Ellsworth market, which was to have one dealership with the Pontiac-Buick-GMC lines and one other dealership with the Chevrolet-Oldsmobile-Cadillac lines. *Id*. ¶ 10. The plan also stated that "General Motors expects all dealer facilities to be in preferred locations, to meet GM Image Standards, and to be devoted exclusively to General Motors." *Id*. ¶ 11. The defendant prefers

exclusive facilities because, in its experience, non-exclusive facilities suffer from diminished sales and service performance for General Motors. *Id*. ¶ 13. The plaintiff was willing to cooperate with the defendant to implement Project 2000 provided that it made business sense for the plaintiff. *Id*. ¶ 15.

In February 1997 representatives of the defendant, the plaintiff and Morrison Chevrolet, the local Chevrolet dealer, met at the plaintiff's corporate offices to discuss a business transaction pursuant to which the plaintiff would transfer its Oldsmobile line to Morrison and discontinue its Cadillac line. *Id*. ¶ 16. Based on the plaintiff's combined planning volume of 80 units per year for Cadillac and Oldsmobile, the defendant indicated at that meeting that its rule of thumb would dictate a payment of $80,000 to the plaintiff. *Id*. ¶ 17. Discussion continued through 1997. *Id*. ¶ 19. On November 10, 1997 representatives of the plaintiff and the defendant met again. *Id*. ¶ 20. The defendant agreed to pay, or cause to be paid to, the plaintiff $120,000. Plaintiff's SMF ¶ 7; Defendant's Responsive SMF ¶ 7. On November 14, 1997 the defendant presented the plaintiff with a draft of an Exclusive Use Agreement ("EUA") and other proposed transactional documents. Defendant's SMF ¶ 22; Plaintiff's Responsive SMF ¶ 22. The plaintiff's president initially told the defendant's representative that the plaintiff objected to the exclusivity provision. Plaintiff's SMF ¶ 11; Defendant's Responsive SMF ¶ 11.

The plaintiff consulted outside counsel, who was familiar with the Maine Dealer Act, 10 M.R.S.A. § 1171 *et seq*., in connection with this transaction. Defendant's SMF ¶¶ 25-26; Plaintiff's Responsive SMF ¶¶ 25-26. The plaintiff requested various changes to the language of the documents, include the scope of the releases, some of which the defendant accepted. *Id*. ¶ 27. The plaintiff executed the EUA, a Termination and Release Agreement and a Letter Agreement on December 22, 1997, after which the defendant paid the plaintiff $120,000. *Id*. ¶ 30. Under the EUA, the plaintiff

was required to provide the defendant with exclusivity for fifteen years at the "Property," which was defined as "[t]he Dealership Site [i.e., Darling's existing location] and other location[s], if any approved from time to time for the conduct of Dealership Operations." *Id.* ¶ 31. The relevant provision stated that:

> Exclusive Use. [Darling's] hereby agrees that, at all times during the Exclusivity Period, it shall actively and continuously conduct Dealership Operations for [GM] at the Property in accordance with the terms of the Dealer Agreements. The Property may not be used for any purpose other than Dealership Operations under the Dealer Agreements (including the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term "Dealership Operations" in the Dealer Agreements), during the [fifteen year] Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld in GM's sole discretion. By execution of this Agreement, however, GM consents to operation by [Darling's] of dealership operations for the One Permitted Non-GM Line at the Dealership Site.

*Id*. ¶ 32. The One Permitted Non-GM Line was defined as Jeep and Eagle. *Id*. ¶ 34.

Between 1997 and 2004, the EUA had no impact on the plaintiff's operations and the plaintiff never advised anyone from the defendant that the EUA violated Maine law. *Id*. ¶ 37. On or about October 1, 2001 the defendant distributed to its dealers its Dealer Bulletin GM 01-19, Non-GM Dual Policy. Plaintiff's SMF ¶ 24; Defendant's Responsive SMF ¶ 24. The purpose of the bulletin was "to reiterate GM's policy that non-GM products should not be sold or serviced at GM dealerships." *Id.* ¶ 25. The policy stated that "any GM dealer that wishes to represent another manufacturer is advised to establish a distinct dealer company for any non-GM brands, and to locate those brands independent of the GM Dealership Premises." *Id*.

In April 2004 the plaintiff advised the defendant that it was proposing to build a new facility to house its Pontiac, Buick, GMC and Jeep lines. Defendant's SMF ¶ 39; Plaintiff's Responsive SMF ¶ 39. The plaintiff wanted to move because its existing facilities were outdated and it wanted a larger facility with a better lot layout. *Id*. ¶ 40. Initially, the plaintiff advised the defendant that it intended to

build two showrooms, one for its GM lines and one for its Jeep line, but then advised the defendant that it had decided to construct a single combined showroom for all four lines. *Id*. ¶ 41. The defendant approved this proposed configuration. *Id*. ¶ 42. The approval cited only the Non-GM Dual Policy. Plaintiff's Responsive SMF ¶ 42.

In September 2004 the plaintiff advised the defendant that it had entered into an agreement to purchase the Dodge and Chrysler lines from a local DaimlerChrysler dealer and that it intended to incorporate all of its GM and DaimlerChrysler lines at the proposed new facility. Defendant's SMF ¶ 43; Plaintiff's Responsive SMF ¶ 43. In its agreement with DaimlerChrysler, the plaintiff agreed to provide an exclusive showroom and a separate and exclusive service write-up area for the DaimlerChrysler lines within the proposed new facility. *Id*. ¶ 44. The defendant advised the plaintiff by letter dated October 13, 2004 that it would not approve the proposed addition of Dodge and Chrysler to the new facility, based on its preference for exclusive facilities and its rights under the EUA. *Id*. ¶ 47. On October 20, 2004 the plaintiff's president and the outside counsel who had represented it in the 1997 transaction wrote to the defendant, identifying a number of "practical options in light of [GM's] rejection letter," including "to build a new DaimlerChrysler facility at the 331 High Street site and leave GM at the location." *Id*. ¶¶ 48, 50. On October 25, 2004 the president of the plaintiff wrote to the defendant asking whether it would object to the substitution of the Dodge and Chrysler lines for the Jeep and discontinued Eagle lines at the plaintiff's present location. *Id*. ¶ 53. The defendant eventually approved that substitution. *Id*. On November 5, 2004 the defendant advised the plaintiff that it agreed with the proposal to move DaimlerChrysler to the proposed new facility and leave GM at the existing location. *Id*. ¶ 51.

Shortly after the defendant approved substituting Dodge and Chrysler for Jeep, the plaintiff inquired whether the defendant would be willing to consent to its operation of all three

8

DaimlerChrysler lines both temporarily at its existing location and permanently at the new location, in exchange for which the plaintiff would provide the defendant with an exclusive showroom, service reception area, sales staff and other amenities.  *Id*. ¶ 57.  On December 10, 2004 the parties met to discuss this proposal and the plaintiff sent a follow-up letter outlining what the plaintiff's president characterized as the plaintiff's "offer" and asking the defendant to "get back to me with either a 'yes' or a 'no' by Wednesday, December 15, 2004."  *Id*. ¶ 59.  The next day, the defendant advised the plaintiff that it was agreeable to the proposed arrangement provided that the plaintiff agreed to provide a separate service drive, reception area and waiting lounge for GM customers at the new facility.  *Id*. ¶ 60.  The following day, the plaintiff rejected the defendant's proposal.  *Id*. ¶ 61.

The plaintiff maintained a reasonable line of credit for each of its GM franchises in 1997 and thereafter.  Plaintiff's SMF ¶ 21; Defendant's Responsive SMF ¶ 21.  The defendant has never brought to the attention of the plaintiff any problems relative to the sufficiency of the plaintiff's line of credit or the compliance of the facility at 265 High Street in Ellsworth with the reasonable facilities requirements of the defendant in 1997 or at any time thereafter.  *Id*. ¶¶ 22-23.

### III.  Discussion

### A.  Declaratory Judgment

The complaint in this action seeks a declaratory judgment to the effect that "it is unlawful for GM to require Darling's to refrain from locating both its Daimler-Chrysler dealership . . . with its GM dealership at the proposed new facility . . . on the basis of the non-dual policy and the Exclusive Use Agreement" and that "it is unlawful for GM to reject Darling's request to house Chrysler, Dodge and Jeep at the current 265 High Street unless Darling's agreed [sic] to accommodate GM with separate and exclusive facilities at the proposed 331 High Street location," along with financial damages and attorney fees.  Complaint (Exh. A to Docket No. 1) at 5.  The plaintiff seeks summary judgment with

9

respect to the requested declaratory relief.  The defendant seeks summary judgment on all claims.

There is only one count in the complaint; the plaintiff seeks monetary damages and attorney fees as

well as a declaratory judgment.

The provisions of Maine's Motor Vehicles Dealer Act in effect at the relevant time provide:

> The following acts shall be deemed unfair methods of competition and unfair and deceptive practices.  It shall be unlawful for any:
>
> * * *
>
> **3.  Certain interference in dealer's business**.  Manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch of division, or officer, agent or other representative thereof:
>
> * * *
>
> **M.**  To require, coerce or attempt to coerce a franchisee to refrain from participation in the management of, investment in or the acquisition of any other line of new motor vehicle or related products as long as the franchisee maintains a reasonable line of credit for each franchise and the franchisee remains in substantial compliance with reasonable facilities requirements of the franchisor.  The reasonable facilities requirements may not include any requirement that a franchisee establish or maintain exclusive facilities, personnel or display space when the requirements are unreasonable considering current economic conditions and are not otherwise justified by reasonable business considerations.  The burden of proving that current economic conditions or reasonable business considerations justify exclusive facilities is on the franchisor.

10 M.R.S.A. § 1174(3)(M) (2003).[2]

The plaintiff contends that the exclusive use agreement prevents it from acquiring another line

of new motor vehicles, that the defendant required or coerced its consent to the exclusive use

agreement and that the exclusive use agreement therefore violated this statute, making it void *ab initio*.

 Plaintiff's Motion at 6-8.  It also contends that the Non-GM Dual Policy is unenforceable because it

violates this statute, *id*. at 8-9, and that the defendant's affirmative defenses of waiver, estoppel and

---

[2] The parties appear to agree, Plaintiff's Motion at 6; Memorandum in Support of General Motors Corporation's: (1) Opposition to Darling's Motion for Summary Judgment, etc. ("Defendant's Memorandum") (Docket No. 29) at 2 n.1, that this version of subsection (M), rather than the version in effect after 2003, which deletes the words after "display space" in the second sentence of the subsection, applies to the claims in this case.  10 M.R.S.A. § 1174(3)(M) (Supp. 2005).

accord and satisfaction are not supported by the evidence. *Id*. at 9-11. The defendant contends that the statute does not prohibit the parties from entering into an exclusive use agreement; that it did not coerce or require the plaintiff to enter into the exclusive use agreement "as a matter of law;" that the defendant did not prevent the plaintiff from acquiring another vehicle line or proceeding as it wished with a joint facility at the new address; and that the plaintiff's claims are barred by the applicable statute of limitations[3] and by the doctrines of waiver and estoppel.[4] Defendant's Memorandum at 9-18. Finally, it asserts that an issue of fact exists with respect to the question whether the exclusive use agreement was justified by "current economic conditions" or "reasonable business considerations."[5] *Id*. at 19-20.

As noted earlier, the exclusive use agreement provides, in relevant part:

> Exclusive Use. [Darling's] hereby agrees that, at all times during the Exclusivity Period, it shall actively and continuously conduct Dealership Operations for [GM] at the Property in accordance with the terms of the Dealer Agreements. The Property may not be used for any purpose other than Dealership Operations under the Dealer Agreements (including the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term "Dealership Operations" in the Dealer Agreements), during the [fifteen year] Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld in GM's sole discretion. By execution of this Agreement, however, GM consents to operation by [Darling's] of dealership operations for the One Permitted Non-GM Line at the Dealership Site.

---

[3] The plaintiff correctly points out that the statute of limitations was not pleaded by the defendant in either its initial or its amended answer, Docket Nos. 2 & 7, and that this affirmative defense is waived if not properly pleaded, citing *Depositors Trust Co. v. Slobusky*, 692 F.2d 205, 208 (1st Cir. 1982). Plaintiff's Combined Reply Memorandum and Memorandum in Opposition, etc. ("Plaintiff's Opposition") (Docket No. 41) at 10 n.1. I have denied the defendant's belated motion for leave to amend its answer to plead this affirmative defense, Docket No. 49, and accordingly will not consider it further, *see In re Cumberland Farms, Inc.*, 284 F.3d 216, 225 (1st Cir. 2002).

[4] The defendant does not mention its pleaded affirmative defense of accord and satisfaction and must be deemed to have waived opposition to the plaintiff's motion on this basis. Considering this defense on its merits, as I must, *Lopez v. Corporación Azucarera de Puerto Rico*, 938 F.2d 1510, 1517 (1st Cir. 1991), I conclude that the defendant has not offered admissible evidence sufficient to allow a reasonable factfinder to conclude that the elements of this defense are present, *see, e.g., United States v. Thurston*, 346 F.Supp.2d 215, 219-20 (D. Me. 2004). As a result, the plaintiff is entitled to summary judgment on this defense.

[5] The defendant does not contend that the plaintiff failed to maintain a reasonable line of credit or was not in substantial compliance with the defendant's reasonable facilities requirements, the other elements of 10 M.R.S.A. § 1174(3)(M).

Defendant's SMF ¶ 32; Plaintiff's Responsive SMF ¶ 32.   The exclusive use agreement also provides that:

> [Darling's] has reviewed the Agreement with its legal, tax or other advisors and is fully aware of all of its rights and alternatives.  In executing this Agreement, [Darling's] acknowledges that its decisions and actions are entirely voluntary and free from any mental, physical, or economic duress.

*Id*. ¶ 36.  The defendant issued to its dealers its Dealer Bulletins GM 01-18 and GM 01-19 on or about October 1, 2001.  Plaintiff's SMF ¶¶ 24, 26; Defendant's Responsive SMF ¶¶ 24, 26.  Dealer Bulletin GM 01-18 states, in part, "as most recent[ly] set forth in Dealer Bulletin No. GM 01-19, GM's policy is that GM products should not be sold or serviced from GM dealerships that also promote non-GM products."  *Id*. ¶ 26.  Dealer Bulletin GM 001-19 states, in part, that its purpose "is to reiterate GM's policy that non-GM products should not be sold or serviced at GM dealerships," that "any GM dealer that wishes to represent another manufacturer is advised to establish a distinct dealer company for any non-GM brands, and to locate those brands independent of the GM Dealership Premises," and that "[i]t has been [GM's] experience that when a GM dealer assumes responsibility of representing non-GM product lines within a GM facility, the results are frequently diminished sales and service performance for General Motors."  *Id*. ¶ 25.

Neither the policies stated in the two bulletins nor the quoted language from the exclusive use agreement in terms violate section 1174(3)(M).  The statute prohibits a manufacturer or distributor of motor vehicles to "require, coerce or attempt to coerce" a dealer into an exclusive arrangement.  It cannot reasonably be read to ban or make unlawful any exclusive arrangement between such parties.  The plaintiff's assertion that the exclusive use agreement at issue here "violates the express prohibition against such agreements set forth in" section 1174(3)(M), Plaintiff's Motion at 1, mischaracterizes the statutory language.  The plaintiff is not entitled to relief on the basis of this

argument.[6] It is the circumstances surrounding the execution of the exclusive use agreement that are the subject of the statutory prohibition, not exclusive agreements *per se*. In addition, the plaintiff has not submitted evidence through its statements of material facts that would allow a reasonable factfinder to conclude that compliance with the two bulletins was imposed on it by the defendant. I will not consider the bulletins further as a basis for liability on the plaintiff's claims against the defendant.

The plaintiff next asserts that it was coerced into executing the exclusive use agreement, despite the statement to the contrary included in the document and quoted above. Plaintiff's Motion at 8. Its argument on this issue, in its entirety, is the following:

> As stated above, GM approached Darling's in 1997 with its request that Darling's cease to sell the Oldsmobile and Cadillac lines of GM new motor vehicles at the Darling's Ellsworth facility. The ensuing discussions concerned the amount of the payment to be made by GM or others to Darling's in return for Darling's agreement to relinquish those lines. After GM and Darling's agreed on the amount of the payment, GM presented Darling's with the Exclusive Use Agreement. GM's representative, Mr. Walsh, made it clear to John Darling that the Exclusive Use Agreement was not negotiable and that Darling's had to execute it to complete the transaction involving the Oldsmobile and Cadillac lines of GM products. On the undisputed facts, it is apparent that Darling's assent to the Exclusive Use Agreement was coerced.

*Id*. Several of the factual assertions in this brief discussion are disputed by the defendant. *See* Defendant's Responsive SMF ¶¶ 6-8, 10, 12, 17-18. Even if that were not the case, this factual presentation would not allow a reasonable factfinder to conclude that the plaintiff was coerced into signing the exclusive use agreement. While the Maine Law Court has not had occasion to construe the word "coerce" in section 1174(3)(M), the First Circuit, construing the federal Automobile Dealers' Day in Court Act, has held that coercion "must include a wrongful demand that would result in penalties or sanctions if not complied with," and that "conditioning continuation of a franchise upon

---

[6] For the same reason, the plaintiff's contention that the exclusive use agreement is void because it is contrary to public policy, Plaintiff's Motion at 8-9, is without merit.

certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion" if the condition was not unfair or inequitable. *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 43 (1st Cir. 2004) (citations and internal quotation marks omitted). *See also General Motors Corp. v. Villa Marin Chevrolet, Inc.*, 2000 WL 271965 (E.D. N.Y. Mar. 7, 2000), at *17. This is consistent with the definition of "coerce" as "[t]o compel by force or threat" in *Black's Law Dictionary* (7th ed. 1999) at 252. The plaintiff's brief presentation does not identify any reason why the exclusive use agreement was a condition that was unfair or inequitable beyond the argument that the agreement violated an absolute proscription created by the statute, an interpretation that I have rejected. The plaintiff is not entitled to summary judgment on the basis of alleged coercion by the defendant. *See generally Rochester Ford Sales, Inc. v. Ford Motor Co.,* 287 F.3d 32, 39-43 (1st Cir. 2002).

The plaintiff also argues that it was required by the defendant to execute the exclusive use agreement, Plaintiff's Motion at 7-8, and here a closer question is presented, albeit in similarly terse fashion. The defendant contends that "a dealer is not 'required' to take any action where a manufacturer simply presents it with the option of consummating a business transaction." Defendant's Memorandum at 12. In *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58 (1st Cir. 1992), the First Circuit, construing an earlier version of section 1174(3)(M), held that evidence showing that the defendant's representatives had told the plaintiff that the defendant would consider setting up a rival dealership if the plaintiff added other brands did not amount to "requiring" that the plaintiff enter into an exclusive franchise agreement. *Id*. at 64. Contrary to the defendant's argument, Defendant's Memorandum at 13, I disagree that *Schott* presents "arguably more compelling facts" than does the instant case. It is instead distinguishable from the facts present in the summary judgment record here. A statement that the plaintiff will not be paid $120,000 unless it executes an

14

exclusive use agreement, *see* Plaintiff's SMF ¶ 13; Defendant's Responsive SMF ¶ 13, presents much more of a "requirement" than does a statement that the defendant might provide products to a competitor.  The defendant makes much of the fact that the plaintiff was represented by counsel throughout the discussions leading up to the execution of the exclusive use agreement and that the plaintiff's president, who signed the agreement, was an experienced businessman, Defendant's Memorandum at 13-14, but those factors cannot be determinative of the question whether the defendant "required" the plaintiff to accept the exclusive use agreement.  Many facts relevant to this question are disputed by the parties, including whether the $120,000 was paid or caused to be paid by the defendant "solely for the releases and waivers set forth in the Termination and Release Agreement and for the agreement of Darling's to terminate the Oldsmobile and Cadillac lines at its Ellsworth location," Plaintiff's SMF ¶ 8; when the amount of this payment was agreed to, *id*. ¶ 10; whether the parties actually negotiated the exclusive use agreement, *id.* ¶¶ 12, 17; whether the defendant required the plaintiff to execute the exclusive use agreement, *id*. ¶ 13; whether John Darling's testimony is evidence that the plaintiff was required to execute the exclusive use agreement, *id*. ¶ 18; whether the defendant ever presented agreements to the plaintiff on a basis other than "take it or leave it," Plaintiff's Statement of Additional Material Facts, etc. ("Plaintiff's Supplemental SMF") (Docket No. 40) ¶ 12; and whether the plaintiff benefited in any way from the exclusive use agreement, *id*. ¶ 15.  On the showing made, neither the plaintiff nor the defendant is entitled to summary judgment on the claim that the plaintiff was "required" to enter into the exclusive use agreement.  It is therefore unnecessary to consider the defendant's argument concerning economic conditions or reasonable business considerations that may have existed at the relevant time.

## B.  Affirmative Defenses

Remaining for consideration are the affirmative defenses of waiver and estoppel.

1. *Waiver.*  The defendant contends that "Darling's voluntary acceptance of the benefits of the 1997 business transaction, together with its almost seven year delay in attempting to repudiate the agreement," bar the plaintiff's claims.  Defendant's Memorandum at 17.  The plaintiff responds that "there are no facts demonstrating that Darling's knew of the right it had under the 1997 version of the statute to reject the Exclusive Use Agreement, and voluntarily agreed to relinquish that right."  Plaintiff's Opposition at 9.  The defendant asserts that the plaintiff "was aware of its statutory rights during these intervening years because it challenged the alleged imposition of exclusivity by another manufacturer" in *Darling's v. Nissan N. Am., Inc.*, 117 F.Supp.2d 54 (D. Me. 2000).  Defendant's Memorandum at 18.

At common law, a contracting party may waive a claim of economic duress by failing to act promptly to repudiate the contract.  *See In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989); *Veilleux v. Fulmer*, 2000 U.S.Dist.LEXIS 8748 (D. Me. June 19, 2000), at *4 -*5 (4-year silence amounts to ratification of voidable agreement).  This concept applies to statutory claims as well.  *Deren v. Digital Equip. Corp.*, 61 F.3d 1, 2-3 (1st Cir. 1995) (ERISA).  Under Maine law, waiver is "the voluntary and knowing relinquishment of a right and may be shown by a course of conduct signifying a purpose not to stand on a right, and leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon."  *Department of Human Servs. v. Bell*, 711 A.2d 1292, 1294-95 (Me. 1998) (quoting *Department of Human Servs. v. Brennick*, 597 A.2d 933, 935 (Me. 1991)).  "If a party in knowing possession of a right does something inconsistent with the right or that party's intention to rely on it, the party is deemed to have waived the right."  *Associated Builders, Inc. v. Coggins*, 722 A.2d 1278, 1281 (Me. 1999).

In support of its assertion that there is no evidence that it knew of its rights under section 1174(3), the plaintiff cites directly to the deposition of John Darling as the plaintiff's representative

16

pursuant to Fed. R. Civ. P. 30(b)(6).  Plaintiff's Opposition at 9.  Under this court's Local Rule 56, all factual information upon which a party to a motion for summary judgment wishes to rely must be presented in a statement of material facts.  This was not done as to Darling's cited deposition testimony.  Even if this evidence were properly before the court, Mr. Darling's testimony that he "did not recall reviewing the statute before signing the Agreement," *id*., does not establish, even when reasonable inferences are drawn in favor of the plaintiff, that the plaintiff was not aware of section 1174 at that time.  The case law cited by the defendant, Defendant's Memorandum at 18, establishes that the plaintiff was familiar with section 1174 in general, and its application to automobile manufacturers seeking exclusivity with dealers in June 2000, *Darling's v. Nissan N. Am., Inc*., 117 F.Supp.2d 54, 57 (D. Me. 2000), less than three years after the exclusive use agreement at issue in this case was signed, Defendant's SMF ¶ 30; Plaintiff's Responsive SMF ¶ 30 (exclusive use agreement executed on December 22, 1997).  It is also undisputed that the plaintiff consulted its outside general counsel in connection with the transaction that included the exclusive use agreement and that this attorney "was familiar with the Maine Dealer Act when he reviewed and commented on the draft agreements."  *Id*. ¶¶ 25-26.  This evidence is sufficient to establish that the plaintiff had knowledge of section 1174 at the time it entered into the exclusive use agreement.[7]  Even if that were not the case, the plaintiff clearly had full knowledge of section 1174 and its application to exclusive arrangements between manufacturers and dealers almost five years before it brought this action.  The plaintiff's failure to bring this action in the intervening years is evidence of a voluntary relinquishment of its rights under the statute.

---

[7] I note that the plaintiff "first sought relief under Section 1176 claims from the Federal Court in 1995."  Reply Affidavit of John B. Darling ("Darling Reply Aff.")  (Attachment 2 to Plaintiff's Supplemental SMF) ¶ 20. That section of the Act governs warranty claims between a manufacturer of motor vehicles and a dealer.

With respect to the time of the execution of the exclusive use agreement, the plaintiff apparently contends that it did not voluntarily relinquish any claim that it might be able to bring under the statute because "[i]t is undisputed that [John Darling] signed the Agreement for Darling's because the representative from GM told him that it was not negotiable," citing paragraphs 12 and 18 of its statement of material facts.  Plaintiff's Motion at 9.[8]  The defendant denies both of these paragraphs, Defendant's Responsive SMF ¶¶ 12, 18, although its denial of paragraph 12 is not directly responsive.  In any event, even if the plaintiff's execution of the exclusive use agreement was not voluntary, the plaintiff has offered no evidence of any events or actions between the execution of the agreement in December 1997 and the filing of this action in April 2005 that prevented the plaintiff from bringing this action or otherwise repudiating the agreement in the interim.  Rather than address this period of time, the plaintiff contends that a waiver of its rights under section 1174 is not possible as a matter of law "because it is against public policy to allow private parties to circumvent the express prohibition contained in § 1174."  Plaintiff's Motion at 10.  This argument would work only if section 1174 prohibited any and all exclusive agreements between motor vehicle manufacturers and dealers, regardless of the circumstances, an interpretation which I have already rejected.

On the showing made, the defendant is entitled to summary judgment on all claims asserted under section 1174 on the basis of waiver.

2.  *Estoppel*.  The defendant contends that the plaintiff "is also estopped from avoiding the terms of the EUA based on its representations and conduct in this case."  Defendant's Memorandum at 18.  I will address this alternate argument briefly in the event that my recommendation with respect to the waiver defense is not adopted.

Under Maine law,

---

[8] The plaintiff does not revisit the waiver issue in its reply memorandum.  Plaintiff's Opposition, *passim*.

> [b]efore the doctrine of estoppel may be invoked, the declarations or acts
> relied upon must have induced the party seeking to enforce an estoppel to do
> what resulted to his detriment and what he would not otherwise have done.
>
> * * *
>
> An estoppel forbids the assertion of the truth by one who has knowingly
> induced another to believe what is untrue and to act accordingly.  While
> waiver rests upon intention, estoppel rests upon misleading conduct.

*Roberts v. Maine Bonding & Cas. Co.*, 404 A.2d 238, 241 (Me. 1979) (citation omitted).  Here, the

defendant relies on a statement in the exclusive use agreement as the misrepresentation on which it

relied.  Defendant's Memorandum at 18.  Specifically, the defendant refers to the following language

in the exclusive use agreement:

> [Darling's] has reviewed this Agreement with its legal, tax or other advisors
> and is fully aware of all of its rights and alternatives.  In executing this
> Agreement, [Darling's] acknowledges that its decisions and actions are
> entirely voluntary and free from any mental, physical, or economic duress.

Defendant's SMF ¶ 36; Plaintiff's Responsive SMF ¶ 36.  The defendant  apparently contends that its

reliance on this statement resulted in its payment of $120,000 to the plaintiff, which it characterizes as

a detriment.  Defendant's Memorandum at 18.  The plaintiff asserts that  "there is no evidence

indicating that John Darling or others at Darling's knowingly induced GM to believe that the Exclusive

Use Agreement was a valid, enforceable contract."  Plaintiff's Motion at 10.  It responds to the

defendant's argument by asserting that it "earned the payment of $120,000 and GM received the

benefit it bargained for in agreeing to that payment, when Darling's surrendered the Oldsmobile and

Cadillac lines."  Plaintiff's Opposition at 15.  It points out that "there is no mention of the payment in

the EUA and the Termination and Release Agreement states that the payment was consideration solely

for the termination."  *Id*. at 16.

The parties are very much in disagreement about the $120,000 payment which is the only

"detriment" identified by the defendant in connection with its estoppel argument.  The defense requires

that the defendant have been induced to rely on the plaintiff's misrepresentation to its detriment.

*Chrysler Credit Corp. v. Bert Cote's L/A Auto Sales, Inc.*, 707 A.2d 1311, 1318 (Me. 1998).  The plaintiff asserts that the payment was only in return for the surrender of its dealership in Oldsmobile and Cadillac lines, which the defendant agrees that it sought.   Plaintiff's SMF ¶ 5; Defendant's Responsive SMF ¶ 5.  It is not possible to determine, given the factual disputes in the record, whether this payment was made independent of the exclusive use agreement, as the plaintiff claims, or in return for the exclusive use agreement, as the defendant claims.  *See* Plaintiff's SMF ¶¶ 6-10, Defendant's Responsive SMF ¶¶ 6-10; Defendant's SMF ¶¶ 16-22, 28, 30, Plaintiff's Responsive SMF ¶¶ 16-22, 28, 30; Plaintiff's Supplemental SMF ¶ 14; General Motors Corporation's Response to Plaintiff's Statement of Additional Material Facts, etc. (Docket No. 46) ¶ 14.  If the payment was not tied to the exclusive use agreement, it cannot have been the detriment necessary to invoke the doctrine of estoppel.  In addition, the record evidence is in dispute as to whether the defendant's purported reliance on the language in the exclusive use agreement, which appears to have been drafted by the defendant, *see* Darling Reply Aff. ¶¶ 13-15 & Defendant's SMF ¶ 34, was justifiable, as the law requires, *Chrysler Credit*, 707 A.2d at 1318, when the plaintiff offers disputed evidence to the effect that John Darling told the defendant that he did not want to enter into the agreement  and that he attempted to modify the agreement. Plaintiff's SMF ¶¶ 11-12, Defendant's Responsive SMF ¶¶ 11-12; Defendant's SMF ¶ 29, Plaintiff's Responsive SMF ¶ 29.

Neither party is entitled to summary judgment on the estoppel defense.

## IV. Conclusion

For the foregoing reasons, and because all of the plaintiff's claims appear to arise from 10 M.R.S.A. § 1174, I recommend that the defendant's motion for summary judgment be **GRANTED** and that the plaintiff's motion for partial summary judgment be **DENIED.**

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 21st day of April, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge